# Exhibit B

---

**From:** Kyle McFadden <km@cbkfs.com>
**Sent:** Monday, July 17, 2023 11:40 AM
**To:** Douglas Stockham <douglasstockham@gmail.com>; trishdonnelley@mac.com
**Subject:** Re: CBK Group 10 Agreements

Good morning, Doug and Trish.

Wire the funds according to the details here (Truist bank) that is our active account and also go through the files, sign and send it back to me today.

**Kyle McFadden**
CBK FINANCIAL SOLUTIONS

140 Royal Palm Way Suite 103
Palm Beach, FL 33480

**Phone:** (561) 309-8688
**Email:** km@cbkfs.com

www.cbkfs.com

CONFIDENTIALITY NOTICE : This email, including attachments, may contain non-public, privileged, and/or confidential information, and is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient(s), please delete this email, including attachments, and notify the sender by return mail, email, or by calling 561-309-8688. The unauthorized review, use, dissemination, distribution, or reproduction of this email, including attachments, is prohibited and may be unlawful.

---

**From:** Kyle McFadden
**Sent:** Sunday, July 16, 2023 8:34 AM
**To:** Douglas Stockham <douglasstockham@gmail.com>; trishdonnelley@mac.com <trishdonnelley@mac.com>
**Subject:** CBK Group 10 Agreements

Good morning, Doug and Trish.

This email is following up on the email sent last week with the Transaction Summary and appraisals.

The Operating Agreement and Subscription Agreement are attached. They mirror the agreements we used on your previous participation. To simplify, the third attachment is the signature pages. When you are able, please send them back and wire the funds.

If you have any questions, let us know.

Thank you,

**Kyle McFadden**

CBK FINANCIAL SOLUTIONS

140 Royal Palm Way Suite 103
Palm Beach, FL 33480

**Phone:** (561) 309-8688
**Email:** km@cbkfs.com

www.cbkfs.com

TRUIST

**TRUIST BANK**

**20446 S DIXIE HWY,**
**MIAMI , FL 33189**

**ROUTING/ABA NUMBER: 263191387**

**ACCOUNT# 1100019746109**

**FOR CREDIT TO: CBK GROUP 10, LLC**
**140 ROYAL PALM WAY STE 103**
**PALM BEACH FL 33480**

Name of Subscriber:__________________________

THE SECURITIES REFERENCED IN THIS SUBSCRIPTION AGREEMENT WILL BE ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES ACT PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THESE SECURITIES IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THE OPERATING AGREEMENT FOR THE COMPANY.

**CBK Group 10, LLC**

**SUBSCRIPTION AGREEMENT**

THIS SUBSCRIPTION AGREEMENT is made and entered into as of the date of the last signature shown on the signature page hereof, by and between the Subscriber identified on the signature page of this Agreement and CBK Group 10, LLC, a Florida limited liability company (“Company”).

**RECITALS:**

A. The undersigned (“Subscriber” or “Member”) hereby subscribes to purchase a member interest (the “Interest”) in the Company, the manager of which is CBK Financial Solutions, LLC, a Florida limited liability company (“Manager”), in exchange for the initial contribution of capital (collectively, the “Contribution”) as more fully specified in, and subject to the terms and conditions described herein and in the Operating Agreement under which the Company is created and organized (the “Operating Agreement”). All defined terms used herein and not otherwise defined shall have the meaning set forth in the Operating Agreement. Subscriptions are being solicited by the Manager, which is not being specially compensated for its solicitation services.

B. The Offering of the Interests is limited to “accredited investors,” as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the “Securities Act”). Subscribers for Interests must subscribe for a minimum aggregate capital contribution of twenty Five Thousand dollars ($25,000), or in such other minimum and incremental amounts below the minimum, as the Manager, in its sole discretion, may elect to accept. The amount being

subscribed for by a Subscriber is referred to herein as the "Subscription Amount." The Manager or its Affiliates may also be Subscribers.

C. The Subscriber has received and reviewed the Operating Agreement, and the terms of the Interests are in all respects subject to the terms and conditions thereof. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THIS SUBSCRIPTION AGREEMENT AND THE OPERATING AGREEMENT, THE TERMS OF THE OPERATING AGREEMENT SHALL CONTROL. Aggregate subscriptions totaling $3,000,000 funded in stages, are being solicited by the Manager, and shall be contributed to the capital of the Company in multiple installments. The first installment of the capital contributions of the Members shall be in the aggregate amount of not less than $25,000 ("Initial Capital Contribution"). The offering period (the "Offering Period") for the Offering shall remain open as long as the Manager shall elect. Further installments of the subscribed amount shall be due and payable by the Members in proportion to their respective Member Percentages upon three (3) days' written notice by the Manager.

The Manager may require (subject to certain limitations set forth in the Operating Agreement) that Additional Capital Contributions be made by the Members (other than the Manager) in the event that the Manager shall determine that additional funds shall be required, or, in the sole discretion of the Manager, may admit additional Members on such terms and conditions, and in exchange for such contributions, as the Manager shall determine. The individual amount to be contributed by a Subscriber shall be based upon proportionate Member Interest of each Member (excluding the Manager). In the event that a Member shall fail to make a Capital Contribution when required (a "Defaulting Member"), and if another Member shall loan the amount that the Defaulting Member failed to contribute (a "Lending Member"), then the Lending Member shall have such rights and remedies as are set forth in the Operating Agreement, including the right to elect to redetermine the Member Percentages of the Defaulting Member and the Lending Member (in the manner and to the extent set forth in the Operating Agreement).

D. The Company has entered into a loan proposal pursuant to which the Company shall make a business loan in the approximate aggregate amount of $3,000,000 ("Loan") to Taryn Pisaneschi, LLC ("Borrower"). The Loan shall be evidenced by a two-year promissory note ("Note"), which is to be personally guaranteed by Taryn Pisaneschi. The Loan will be secured by a first mortgage (the "Mortgage") on the real property owned by the guarantor's parents Lawrence and Diane Kogan located at 6635 Sheffield Lane Miami Beach, FL 33141 and cross collateralized by a second mortgage located at 6625 Brevity Lane Miami Beach, FL 33141 ("Property"). The Note, Mortgage, personal guarantees, and other instruments executed in connection therewith are sometimes referred to herein as the "Loan Documents." Copies of the draft Loan Documents are available upon request to the Manager.

E. The Subscription Amount will be due within two (2) business days of the Company's acceptance of a Subscriber's completed Subscription Agreement. The Company will notify Subscribers of the acceptance of their Subscription Agreement and will provide further information regarding funding.

F. Upon the Release Condition being fulfilled, each Subscriber that has had its subscription accepted by the Company shall be admitted effective as of the date the Release Condition has been fulfilled as a Member of the Company in accordance with the terms and conditions of the Operating Agreement ("Offering Closing").

G. The Company has provided Subscriber with copies of the form of Operating Agreement, and Transaction Summary that provides certain information about the Company, the Loan and the Offering, in addition to this Agreement (collectively, the "Transaction Summary").

**AGREEMENT:**

**NOW, THEREFORE**, the Subscriber hereby agrees as follows:

(i) Subscription. The Subscriber hereby subscribes for and agrees to purchase the Member Interest in the Company for the aggregate purchase price (the "Subscription Price"), each as set forth on the signature page of this Agreement, by delivery of the following a completed and executed copy of this Agreement.

2. Acceptance of Subscription. Subscriber understands and agrees that this Subscription may be rejected, in whole or in part, by the Company at anytime in its sole discretion. If the Subscription is accepted, in whole or in part, the Company will notify Subscriber of same. If the Subscription is rejected, all funds received from the Subscriber will be returned, without interest, by the Company, and, thereafter, this Agreement shall be of no further force or effect. If the Subscription is accepted in part, all funds received from the Subscriber for Member Interests not accepted by the Company will be returned, without interest, by the Company.

3. Subscriber's Acknowledgment of Restrictions on Transfer; No Right to Require Registration. THE UNDERSIGNED SUBSCRIBER UNDERSTANDS THE OFFER AND SALE OF THE MEMBER INTERESTS (THE "SECURITIES") HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"), OR ANY STATE SECURITIES LAWS (COLLECTIVELY, "SECURITIES LAWS") PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER OF THE COMPANY TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OR APPLICABLE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, THE SUBSCRIBER RECOGNIZES THAT HE/SHE HAS NO RIGHT TO REQUIRE THE COMPANY OR THE MANAGER OF THE COMPANY TO REGISTER THE SECURITIES UNDER THE SECURITIES ACT OR RELEVANT STATE SECURITIES LAWS. SUBSCRIBER FURTHER

UNDERSTANDS THAT THE TRANSFER OF THE SECURITIES IS SUBSTANTIALLY RESTRICTED BY THE SECURITIES LAWS AND BY THE ABSENCE OF A TRADING MARKET THEREFOR, AND THE TRANSFER OF THE INTEREST IS ADDITIONALLY RESTRICTED BY THE TERMS OF THE OPERATING AGREEMENT; THAT NO TRADING MARKET FOR THE SECURITIES EXISTS AND NONE IS EXPECTED TO DEVELOP, AND THAT ANY SALE OR OTHER DISPOSITION OF THE SECURITIES MAY RESULT IN UNFAVORABLE TAX CONSEQUENCES. THE SUBSCRIBER ACKNOWLEDGES THAT THE RESTRICTIONS ON THE TRANSFERABILITY OF THE SECURITIES ARE SUBSTANTIAL AND MAY REQUIRE THE SUBSCRIBER TO HOLD THE SECURITIES INDEFINITELY. THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS THAT THE SUBSCRIBER HAS ADEQUATE MEANS OF PROVIDING FOR THE SUBSCRIBER'S CURRENT NEEDS AND POSSIBLE PERSONAL CONTINGENCIES AND HAS NO NEED FOR LIQUIDITY WITH RESPECT TO THE SECURITIES. THE SUBSCRIBER HEREBY ACKNOWLEDGES AND AGREES THAT THE COMPANY SHALL PLACE A LEGEND DENOTING THESE RESTRICTIONS ON ANY CERTIFICATES TO BE ISSUED EVIDENCING THE INTEREST.

4. Representations and Warranties. The Subscriber represents and warrants as follows:

A. The Subscriber understands that the Company was formed to make the Loan and shall have had no operating history prior to the making of the Loan.

B. The Subscriber understands that: (i) an Interest is a speculative investment that involves a high degree of risk of loss of the entire investment of the Subscriber in the Company; (ii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Subscriber, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of an Interest as an investment; (iii) there will be restrictions on the transferability of the Interest under federal and state securities law and pursuant to the Operating Agreement, and there will be no public market for an Interest, and, accordingly, it may not be possible for the Subscriber to liquidate its investment in an Interest; (iv) any anticipated federal and/or state income tax benefits applicable to an Interest may be lost through changes in, or adverse interpretations of, existing laws and regulations; (v) there is no assurance that the Company will ever be profitable, or that the Subscriber's investment in the Interest will ever be recoverable; and (vi) the Subscriber shall have the obligation to make additional contributions to the capital of the Company in addition the initial contribution to the Company, and in the event that the Subscriber or other investors in the Company do not make any requested additional contributions to the capital of the Company, not only may the party not making the required additional contributions to the capital of the Company have his/her Interest reduced but the Company may be unable to pursue its business, in which event, it is possible that the entirety of the Subscriber's investment in the Interest will be lost.

C. The Subscriber hereby acknowledges that: (i) the risks inherent to real estate loans in general, and to this venture, in particular, have been fully considered; (ii) the Manager may cause the dissolution of the Company, which may occur prior to the return of any capital or the repayment of any loans, and upon such dissolution there is the risk that the

Subscriber may not receive a return of all, or any portion of, the Subscriber's capital contributions to the Company; and (iii) an investment in the Interest has not been approved or disapproved by the Securities Exchange Commission or the Securities Division of the Department of Financial Services of the State of Florida or any other department or agency of any other jurisdiction, nor have such authorities passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Interest.

D. The Subscriber's financial condition is such that it has no need for liquidity with respect to its investments in the Interest to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of its investment in the Interest for an indefinite period of time, including the risk of losing all of its investment.

E. The Subscriber has reviewed the provisions of the Operating Agreement regarding the distribution of Available Cash and the allocations of Profits and Losses, and either individually or with the assistance of professionals, understands such provisions.

5. Access to Information. The Subscriber hereby acknowledges and confirms that the Subscriber has been given and reviewed a copy of the Transaction Summary and given complete access to all other documents, records, contracts and books of or relating to the Company and the Interest, now existing, and all other information to the extent the Company possesses such information or can acquire it without unreasonable effort or expense, and that the Subscriber has engaged in a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Subscriber in reaching the Subscriber's decision to invest in the Company. The Subscriber hereby further acknowledges and confirms that the Subscriber has had an opportunity to ask questions of and receive answers concerning the Loan, the Property, the Loan Documents, the Company, the prospective contemplated business and purpose of the Company, and with respect to any other matter the Subscriber has deemed relevant, and all such inquiries have been answered to the Subscriber's satisfaction. Subscriber acknowledges that any financial projections are merely illustrations of potential investment results, and there is no assurance that the actual results of operations will be as set forth in any such illustrations. Subscriber acknowledges that he/she has had and may have, at the offices of the Company, at any reasonable hour, after reasonable prior notice, access to all information about the Company, the Loan or the Offering which the Company can obtain without unreasonable effort or expense, and further acknowledges that Subscriber has obtained, in Subscriber's judgment, sufficient information from the Company to evaluate the merits and risks of an investment in the Company. Subscriber has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, he/she is capable of evaluating the merits and risks of an investment in the Company by making an informed investment decision with respect thereto.

6. No Representations. Subscriber represents and warrants that in making the decision to purchase the Interest herein subscribed for, Subscriber has relied solely upon independent investigations made by Subscriber, and the Subscriber further represents and warrants that the Subscriber is not acquiring the Interest as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media, any seminar or any solicitation by a person not previously known to the Subscriber, and that

Subscriber is not aware of any general solicitation or general advertising regarding the purchase of the Interest. Subscriber has been provided with a Transaction Summary prepared by the Manager solely for informational purposes and for use in evaluating participation in the Company. Subscriber acknowledges that the Transaction Summary contains information that the Manager believes is accurate and, as same relates to the projected revenues and expenses of the Company, data that the Manager believes is a reasonable forecast of the results the Company might achieve; however, as an experienced and sophisticated investor, Subscriber is aware that there are a myriad of foreseeable and unforeseeable events that could cause the assumptions underlying the financial projections to not materialize, and the results of same may cause material adverse consequences to the financials results of the Company. While the Transaction Summary reflects the terms of the Loan as agreed to in a term sheet with the Borrower, some terms and conditions may be revised between the date of the Transaction Summary and the closing of the Loan. It is reasonably certain that the actual results, both as to revenues and expenses, will differ from the amounts set forth in any projections. Subscriber must evaluate the assumptions relied upon by the Manager and reach its own conclusions as to the reasonableness thereof, as well as any other matters known to Subscriber as an experienced investor that allows Subscriber to analyze the Transaction Summary. The Transaction Summary may contain information obtained by the Company from third parties, and the Company has made no independent investigation of the accuracy or completeness of the information contained in any document prepared by a third party and does not represent or warrant that such information is accurate or complete. Subscriber must rely solely on the terms of the Operating Agreement of the Company for the terms of Subscriber's participation, including, without limitation, the terms of any distributions, and allocations of Profits and Losses to members of the Company.

7. No Commission or Brokerage Fee. The Subscriber represents that the Subscriber has no knowledge of any commission, brokerage fee or other remuneration being paid or to be paid directly or indirectly related to the sale or solicitation of the sale of the Interest.

8. Investment Intent. The Subscriber hereby represents and warrants that the Subscriber is acquiring the Interest solely for the account of the Subscriber for investment purposes only and not for distribution or resale to others. The Subscriber represents that the Subscriber will not resell or offer to resell the Interest except in strict compliance with all applicable Securities Laws.

9. Domicile. The Subscriber represents and warrants that the Subscriber is an individual or type of entity as set forth on the signature page hereto, and is a bona fide resident of the state set forth in his/her address below, and the undersigned agrees that if his/her principal residence changes prior to his/her purchase of the Interest, he/she will promptly notify the Manager of the Company.

10. Reliance on Representations. The Subscriber understands that the Company, and its officers and directors will be relying on the accuracy and completeness of all matters set forth in this Subscription Agreement, and the Subscriber represents and warrants to the Company and its officers and directors that the information, representations, warranties, acknowledgments and all other matters set forth herein with respect to the Subscriber are complete, true and correct and does not fail to include any material fact necessary to make the facts stated, in light of the

circumstances in which they are made, not misleading, and may be relied upon by them in determining whether the offer and sale of the Interest to the Subscriber is exempt from registration under the Securities Laws, and the Subscriber will notify them immediately of any change in any statement made herein that occurs prior to the consummation of the purchase of the Interest hereunder.

11. Entity Existence. If the Subscriber is a corporation, entity, trust, employee benefit plan, individual retirement account, Keogh plan, or other tax-exempt entity, it was not formed for the purpose of acquiring the Interest, it has been in existence for more than 90 days prior to the date hereof, it is authorized and qualified to become an investor in the Company, and the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so.

12. Individual Accreditation. The Subscriber, if an individual, has a net worth in excess of $1,000,000 (excluding the value of the Subscriber's primary residence) and/or has an individual income in each of the two most recent years in excess of $200,000 (or joint income with a spouse in excess of $300,000), and has a reasonable expectation of reaching the same level of income in the current year.

13. Entity Accreditation. The undersigned, if an entity, has a net worth in excess of $5,000,000, was not formed for the purposes of acquiring the Interest, and the decision to invest is being made by an individual meeting the requirements described in Section 12 hereof. Alternatively, if the Subscriber does not meet the requirements of the preceding sentence, each of its equity owners are individuals meeting the requirements described in Section 12 hereof.

14. Confirmation. All information that the Subscriber has provided anywhere in this Subscription Agreement concerning the Subscriber and the Subscriber's financial position is correct and complete as of the date set forth below, and if there should be any material change in such information prior to the acceptance of the Subscriber's subscription for an Interest that is being purchased, the Subscriber will immediately provide such information to the Manager of the Company.

15. Indemnification. Subscriber hereby agrees to indemnify and hold harmless the Company, and its manager, members, employees, agents and attorneys against any and all losses, claims, demands, liabilities and expenses (including reasonable legal or other expenses) incurred by each such person in connection with defending or investigating any such claims or liabilities, whether or not resulting in any liability to such person, to which any such indemnified party may become subject under the Securities Act, under any other statute, at common law or otherwise, insofar as such losses, claims, demands, liabilities and expenses (a) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact made by Subscriber and contained in this Subscription Agreement, or (b) arise out of or are based upon any breach of any representation, warranty or agreement contained herein.

16. Risks of Investment. An investment in the Company is subject to substantial risks. Subscriber is urged to carefully review the risks described in Annex A to this Subscription Agreement prior to making a decision to purchase an Interest.

17. Miscellaneous:

A. Severability. In the event any portions of this Subscription Agreement are found to be void, the remaining provisions of this Subscription Agreement shall nevertheless be binding with the same effect as though the void portions were deleted.

B. Counterparts. This Subscription Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. A telecopied or pdf signature on this Subscription Agreement shall be accepted as binding as if it were an original signature.

C. Notices. All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressee in person, by Federal Express or similar receipted delivery, or if mailed, postage prepaid, by certified mail, return receipt requested, as follows:

Subscriber: At the address designated on the signature page of this Agreement.

The Company: CBK Group 10, LLC
140 Royal Palm Way, STE 103
Palm Beach FL 33480, Suite 8
Attention: Kyle McFadden, Manager
Barry Hoyt, Manager
Joseph Rechter, Manager
Telephone: (561) 309-8688
Facsimile: (561) 655-1466

or to such other address as either of them, by notice to the other may designate from time to time.

D. Governing Law. This Subscription Agreement and any dispute, disagreement, or issue of construction or interpretation arising hereunder whether relating to its execution, its validity, the obligations provided therein or performance thereof shall be governed or interpreted according to the laws of the State of Florida, without giving effect to the conflict of laws provisions thereof. Agreed upon venue, to the extent permitted by law, shall be the state and federal courts in and for Palm Beach County, Florida.

E. Entire Agreement; Amendment; Waiver. This Subscription Agreement constitutes the entire Agreement between the parties and supersedes all prior oral and written agreements between the parties hereto with respect to the subject matter hereof. Neither this Subscription Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, except by a statement in writing signed by the party or parties against which enforcement or the change, waiver, discharge or termination is sought.

F. Section Headings. Section headings herein have been inserted for reference only and shall not be deemed to limit or otherwise affect, in any matter, or be deemed to interpret in whole or in part any of the terms or provisions of this Subscription Agreement.

G. Survival of Representations, Warranties and Agreements. The representations, warranties and agreements contained herein shall survive the delivery of, and payment for, the Interest.

H. Assignability. This Subscription Agreement and the rights and obligations hereunder, and the Interest contemplated hereunder, are not transferable or assignable by the Subscriber, and any such attempted transfer or assignment shall be void ab initio.

I. Benefit. This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors, and assigns.

**[The rest of this page has been intentionally left blank]**

IN WITNESS WHEREOF, the parties have executed this Subscription Agreement as of the date of acceptance set forth beneath the date of the last signature hereon.

**SUBSCRIBER:**

________________________________________ Total Subscription Amount: $__________
Print Name

________________________________________
Signature/Title (if applicable)

________________________________________
Number & Street of Principal Address

________________________________________
City, State and Zip Code

________________________________________
EIN/Social Security Number

Telephone:______________________________

Fax:____________________________________

Email:__________________________________

Manner in which the Interest is to be held:

_________ Individual Ownership

_________ Tenants-in-Common

_________ Joint Tenants with Right of Survivorship

_________ Community Property

_________ Entity

_________ Trust

_________ Corporation

_________ Other (please indicate)

**ACCEPTANCE**

By signing below, the undersigned accepts the foregoing subscription in accordance with the terms hereof.

**CBK Group 10, LLC**

By: CBK Financial Solutions, LLC

By:______________________________
, Manager

Date:_____________________, 2023

# ANNEX A

## RISK FACTORS

The Subscriber understands that in addition to the various risks ordinarily attendant upon equity investments in entities involved in real estate operations, certain unique factors make an investment in the Company subject to a high degree of risk. The Subscriber has been cautioned that an investment in the Company is speculative and involves significant risks, and that it is probably not possible to foresee and describe all of the business, economic and financial risk factors which may affect the Company. The Subscriber acknowledges that he has been advised to seek independent professional advice in order to carefully analyze the risks and merits of an investment in the Company.

The specific risks set forth below have been described in detail to the Subscriber. They are not, however, to be considered exhaustive or definitive of all of the risks involved in an investment in the Interests.

Investment Risks. All loans, including loans secured by real property, are subject to some degree of risk. These risks include adverse changes in general or local economic conditions, such as excessive building and increases in unemployment, as well as other factors affecting real estate values, including the attractiveness of the properties to investors or tenants. Although the Loan is being guaranteed by the principals of the Borrower, there can be no assurance that if called upon that they will be able to satisfy the indebtedness. While the Manager believes that the amount of the Loan is less than the current fair market value of the Property, there can be no assurance that when the Loan will be due that the Property can be sold or refinanced by the Borrower or that the guarantees can be collected upon.

Valuation. There is no assurance that the value placed on the Interests being issued hereunder accurately reflects the current net asset value of the Company of the fair market value for an Interest, or that the Subscribers of Interest will realize such values on the liquidation of the Company. Further, the value of the Property or Mortgage may be less than the Loan amount.

Borrower's Inability to Obtain Financing. The Loan has a term of 12 months, and the Borrower may need to refinance the property, or obtain other equity or debt financing, to satisfy the Loan. There is no assurance that such financing can be obtained by the Borrower.

Financing of Foreclosure. There can be significant costs in foreclosing upon a mortgage. The Company does not currently have sufficient capital to fund a foreclosure proceeding and will only be able to do so if the Company is able to raise additional capital or otherwise finance a foreclosure proceeding. The costs of financing the foreclosure of a second mortgage position may include a desire to finance the satisfaction of the loan or loans secured by the first mortgage (the "Senior Debt"). Because the Senior Debt must be fully satisfied before a second mortgage holder is entitled to receive any proceeds from the sale of the mortgaged property, second mortgage holders often payoff the Senior Debt to ensure that the maximum amount of funds are received as a result of a foreclosure sale. If the Company is unable to raise additional capital or

otherwise finance such a payoff and a first mortgage holder forecloses on its mortgage, there is no guaranty that the foreclosure sale will be managed by the first mortgage holder in such a way as to maximize the proceeds available to satisfy the Company's loans secured by its second mortgage.

Company's Inability to Obtain Financing; Dilution. Under the terms of the Operating Agreement, the Company may obtain financing, and in connection therewith may grant a security interest in the Loan Documents. In such event, the Company may have an ongoing need for additional equity and debt financing to service or satisfy any such debt. There is no assurance that such financing can be obtained by the Company, or that it will be available at favorable or satisfactory terms. The Manager has the right to require that the Members make Additional Capital Contributions. The failure to make such Additional Capital Contributions shall subject the Members to dilution, whether as a result of other Members making additional contributions or loans or as a result of the admission of new Members, and may result in the inability of the Company to service or satisfy debt.

Illiquidity of Investment. There is no current market for the Interests and none is anticipated to develop. Moreover, there are substantial restrictions on the transfer of the Interests. Therefore, the purchase of the Interests must be considered a long-term illiquid investment acceptable only for investors who are willing and can afford to accept and bear the substantial risks of the investment for an indefinite period of time.

Control. Although all Subscribers will have the statutory rights afforded by Florida law, each Subscriber should be aware that control of the Company will be vested in the Manager. The Subscribers have no right to participate in the management or conduct of the Company's affairs. Annual or other meetings of the members of the Company are not anticipated to be held.

Dependence on Manager. The success of the Company in carrying out its plans and operations will be dependent, in substantial part, on the contributions of the Manager and its affiliates. The actual effect of the loss of the Manager's services or the partners of the Manager, by reason of its removal, the death or disability of its principals its adjudication of bankruptcy or insolvency, or otherwise, on the prospects of the Company, however, is impossible to predict. Each Subscriber must independently evaluate whether such Subscriber believes that the Manager has the background and ability to manage the Company. Each Subscriber, upon request, may obtain information about prior transactions with which mangers have been affiliated.

No Guarantee of Investment Success. An investment in the Interests is highly speculative and subject to risks. No assurance can be given that the Company will be profitable, that a Subscriber will realize a return on his investment or that he will not lose the investment altogether.

Additional Cash Contribution Requirement. This is an investment in an asset based loan. There is no guarantee the borrower has the ability to make the required payments. As such, there is a possibility of foreclosure and/or bankruptcy. In either, as well as other instances, the manager may require additional capital from the participants. Participants should be prepared to contribute additional capital.

No Assurance of Company Profit or Cash Distributions. There is no assurance that interest and principal payments shall be made on the Loan sufficient to generate sufficient cash flow available for distribution. The Manager is authorized to pay costs incurred in conducting and completing the Company's activities, to establish and maintain reserves for working capital, taxes, insurance and other costs and expenses, and to use Company revenues to pay the organization and offering costs. The use of Company revenues for such purposes may delay receipt by the Subscribers of available cash distributions from the Company, and may require the Subscribers to report and pay tax on income without receiving contemporaneous cash distributions, even if the Company is profitable.

Regulatory Climate. Statutory, regulatory or administrative actions that affect the Company's business could have adverse effects on the Company's ability to reach its objectives. No assurance can be given that such regulatory changes or controls will not be implemented.

Conflicts of Interest. The Manager and/or certain of its affiliates are presently engaged in the operation of investment entities owning and operating various properties in Florida and engaging in other investment entities, and may form additional investment entities to engage in real property investments and activities similar to those of the Company or may be involved in the management of other similar projects. In addition, in some situations, affiliates of the Manager may invest in such investment entities, as well as to acting as managers and managing members, and receive allocations of profits and losses, distributions and fees in such capacities. As a consequence of these relationships, conflicts of interest between the Company and the Manager and/or its affiliates or such other investment entities may arise, particularly where affiliates of the Manager may have economic interests that do not coincide with those of the Company. These conflicts may not in every case be resolved to the advantage of the Subscribers.

Securities Law Matters. The offer and sale of the Interests has not been registered under the Securities Act or the Florida Securities and Investor Protection Act, or the laws of Florida or any other state, and Interests are offered in reliance upon certain exemptions from registration contained therein. There is no assurance that the offering presently qualifies or will continue to qualify under such exemptions due to, among other things, the adequacy of disclosure, the manner of distribution of the Interests, the existence of similar offerings by the Manager or its affiliates in the past or in the future, the conduct of other activities by the Manager and its affiliates or the change of any securities laws or regulations. To the extent suits for rescission are successfully maintained against the Manager and/or the Company, both capital and assets of the Manager and the Company could be reduced.

Liability of Subscribers for Return of Distributions. Under certain circumstances defined under the Florida Limited Liability Company Act, a Subscriber who receives a distribution from the Company may be liable to repay such distribution to the Company or to its creditors. Such circumstances include, if at the time the distribution was made, as a result of the distribution, the Company is not able to pay its debts as they become due in the usual course of business, or if the Company's total assets would be less than its liabilities.

Fees Not Independently Negotiated. The Manager and certain of its affiliates will receive distributions of funds from the Company, including but not limited to a share of a loan origination fee, annual management fee, and distributions in their capacities as Subscribers of the Company. Although the Manager believes that the amount of such fees and distributions are just and equitable, the amounts of these potential distributions have not been negotiated at arm's length.

Lack of Separate Counsel. The Company and the Manager will be represented by the same legal counsel. Counsel has not been retained to represent the Subscribers.

Changes in the Federal Income Tax Laws. Major changes were made by tax laws enacted in the past 20 years, and more will likely be enacted in the future. All investors should understand that the tax consequences of an investment in the Company are subject to change.

Uncertainty and Complexity of Tax Treatment. The Federal income tax treatment of Company and the ownership of interests therein, whether direct or indirect, are complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. It is possible that the IRS may successfully challenge the tax treatment accorded certain items by the Company.

Method of Accounting. The Company intends to use the cash receipts and disbursements method of accounting. It is possible that the Internal Revenue Service may require the Company to use the accrual method of accounting. In general, the most significant effect of such change would be to require the Company to recognize income earlier than such income would be recognized under the cash method which, in turn, could result in each Subscriber being allocated income without the Company having the corresponding cash. There is no assurance that the IRS will not audit the Company and require it to change to the accrual method of accounting, which change could be required to be made retroactively.

Taxes; Withholding. The Company may withhold a portion of distributions and remit same as federal income taxes. A prospective investor should therefore consult with his own tax advisor prior to making an investment decision.

Company's Allocations. The Company Agreement contains complex allocations. There can be no assurance that such allocations will be respected for Federal income tax purposes by the IRS. Depending on which allocations were to be disregarded, the Subscribers' share of income, gains, losses, deductions and credits of the Company could be affected.

IRS Audit of Income Tax Returns. The IRS may audit the income tax returns of the Company and may audit the income tax returns of a Subscriber as the result of an investment in or claimed deductions or losses from an investment in the Company. Such deductions and losses, when taken together with other items reported on the Subscriber's return, may prompt the IRS to examine the Subscriber's return, both as to income and deductions relating to the Company and as to other matters. No assurance can be given that such an audit or examination will not occur or

that the Subscribers will not incur additional liability and costs as a result of any such audit or examination.

Actions of Tax Matters Partner. The Manager has the authority to negotiate, settle and compromise matters with the IRS relating to all partners of a Company. The Manager may take positions on issues or effect compromises binding on all members of the Company which the Manager believes are in the best interests of the Company, but which may not be in the best interests of individual Subscribers.

Deductibility of Investment Interest. A limitation is placed upon the interest deduction that can be taken by noncorporate taxpayers for “investment interest”, which is generally defined as interest on funds borrowed to acquire or carry property held for investment. Under the Code, interest paid by each Subscriber on funds borrowed to acquire an interest in the Company will be treated as a passive activity deduction, as opposed to investment interest. The tax consequences of such treatment, if applicable, will vary with the circumstances of each Subscriber. Prospective investors should, therefore, consult with their own tax advisors concerning the possible impact of such treatment to them.

Circular 230 Disclosure. Any discussion of federal tax issues in this Subscription Agreement is not intended or written to be used as tax advice. To ensure compliance with IRS Circular 230, potential Subscribers are hereby notified that: (A) any discussion of federal tax issues in this Subscription Agreement is not intended or written to be used, and it cannot be used by any potential Subscriber, for the purpose of avoiding penalties that may be imposed on any such person or entity under the Internal Revenue Code; (B) such discussion is written to support the promotion or marketing of the transactions or matters addressed herein; and (C) potential Subscribers should seek advice based on their particular circumstances from an independent tax advisor.

THE MEMBER INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED, FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE LIMITED LIABILITY COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE LIMITED LIABILITY COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE LIMITED LIABILITY COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THE INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS OPERATING AGREEMENT.

# OPERATING AGREEMENT
# OF
# CBK Group 10, LLC

**THIS OPERATING AGREEMENT** (“Agreement”) is made and entered into effective as of the ______day of __________, 2023, by and between CBK Financial Solutions, LLC, LLC, a Florida limited liability company (“Manager”) and those parties set forth on Schedule A attached hereto (each of which are sometimes hereinafter referred to individually as “Member” and collectively as “Members”).

## W I T N E S S E T H

**WHEREAS,** Articles of Organization (“Articles”) legally creating CBK Group 10, LLC, a Florida limited liability company (“Company”), were filed with the Secretary of State of the State of Florida, and the Articles are approved and the filing thereof ratified; and

**WHEREAS,** the Members desire to participate together as a limited liability company formed under the Florida Limited Liability Company Act to engage in the business described in Section 2.04 hereof; and

**WHEREAS,** the Members desire to express in writing their mutual understandings and agreements with respect to the formation and operation of the Company; and

**WHEREAS,** the Members believe that, the best means to accomplish the foregoing is to supersede any prior agreements or understandings among them by setting forth in this Agreement all the terms, provisions, conditions and covenants by which the Company will be governed.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants and conditions contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## INCORPORATION; DEFINITIONS

1.01 Incorporation. The foregoing recitals are true and correct and, together with any Schedules and Exhibits attached hereto, are hereby incorporated herein and made a part hereof.

1.02 Definitions. Capitalized terms used, but not otherwise defined, herein shall have the meanings hereafter set forth.

1.03 Adjusted Capital Account Deficit. With respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1)and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

1.04 Affiliate. When used with reference to a specified Member, (a) any person who, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Member, (b) any person who is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, the specified Member or of which the specified Member is an officer, partner or trustee, or with respect to which the specified Member serves in a similar capacity, (c) any person who, directly or indirectly, is the beneficial owner of more than ten percent (10%) of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Member or of which the specified Member is directly or indirectly the owner of more than ten percent (10%) of any class of equity securities or in which the specified Member has a substantial beneficial interest or (d) a spouse or descendant of a member or person described above, or a trust for the benefit of the foregoing.

1.05 Agreement. This Operating Agreement or any restatements hereof, as originally executed or amended from time to time.

1.06 Available Cash. Cash funds of the Company, excluding cash proceeds from a Terminating Capital Transaction, if any, and after provision for (i) payment of all outstanding and unpaid current obligations, expenses and charges of the Company as of such time (including all amounts of any principal or interest payable with respect to any loans from Members and compensation to any Members that have provided services to the Company); and (ii) Reserves as determined by the Manager for the management and operation of the Company's business, determined from time to time by the Manager to be available for distribution to the Members.

1.07 Capital Account. An account that, throughout the full term of the Company, shall be established, determined and maintained separately for each Member in accordance with the following provisions:

(a) To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 4.05 or 4.06 hereof, and the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member.

(b) To each Member's Capital Account there shall be debited the amount of cash and the value of any Company property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Sections 4.05 or 4.06 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c) In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d) In determining the amount of any liability for purposes of (a) and (b) of this definition, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041(b) and shall be interpreted and applied in a manner consistent with such Regulations.

1.08 Capital Contribution. The amount of cash or the agreed fair market value of property or services contributed by each Member to the capital of the Company, as reflected in the books of the Company.

1.09 Code. The Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of any federal internal revenue law enacted in substitution of the Internal Revenue Code of 1986.

1.10 Company. CBK Group 10, LLC, a Florida limited liability company.

1.11 Company Accountants. Such independent accountants as may be selected, from time to time, by the Manager.

1.12 Event of Dissolution. Any of the events that result in a dissolution of the Company as set forth in Section 9.01 hereof.

1.13 Fiscal Year. The calendar year.

1.14 Gross Asset Value. With respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed upon by the contributing Member and the Manager;

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager as of the following times: (1) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (2) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; and (3) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (1) and (2) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii) The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Manager; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1 (b)(2)(iv)(m) and Section 4.05(i) hereof; provided, however, that Gross Asset Values shall not be adjusted to the extent the Manager determines that an adjustment pursuant to subparagraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii) or (iii) of this definition, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

For purposes of the foregoing provision, "Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the depreciation, amortization or other cost recovery deduction for income tax purposes for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

1.15 Law. The Florida Limited Liability Company Act, as amended from time to time.

1.16 Manager. CBK Financial Solutions, LLC, a Florida limited liability company, shall serve as Manager, or any person or entity (whether or not a Member) who may be appointed by the Members as Manager after the date hereof.

1.17 Member. A Person admitted as a Member of the Company in accordance with the terms hereof. Except as otherwise provided herein, the Manager shall be considered a Member for all purposes of this Agreement.

1.18 Member Interest or Interests. The entire ownership interest of a Member in the Company at any particular time, including such Member's rights to any and all distributions, allocations and other incidents of participation in the Company to which such Member may be entitled as provided in this Agreement and under applicable law, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement and the Law, and further including its Capital Account hereunder.

1.19 Member Minimum Gain. An amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in the same manner as "partner minimum gain" pursuant to Regulation Section 1.704-2(i).

1.20 Member Nonrecourse Debt. Any nonrecourse debt (for the purposes of Regulation Section 1.1001-2) of the Company for which no Member bears the "economic risk of loss" within the meaning of Regulation Section 1.752-2.

1.21 Member Nonrecourse Deductions. These shall have the meaning set forth in Treasury Regulation Section 1.704-2(i) for "partner nonrecourse deductions." The amount of Member Nonrecourse Deductions with respect to Member Nonrecourse Debt for any Fiscal Year equals the excess, if any, of (a) the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during such Fiscal Year, over (b) the aggregate amount of any Distributions during that Fiscal Year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain

attributable to such Member Nonrecourse Debt, determined in accordance with Regulation Section 1.704-2(i).

1.22 Member Percentages. The respective percentage of interest of each Member in the Company.

1.23 Nonrecourse Deductions. Deductions of the Company described in Section 1.704-2(b)(1) of the Regulations.

1.24 Nonrecourse Liability. The liability of the Company described in Sections 1.704-2(b)(3) and 1.752-1(a)(2) of the Regulations.

1.25 Person. Any individual, partnership, corporation, limited liability company, trust or other entity.

1.26 Preferred Return. Preferred Return means an amount determined by multiplying ten (10 %) per annum by the average monthly balance of a Member's Unreturned Capital, calculated as of the funding of the loan to the Borrower. To the extent there is sufficient Available Cash, the Preferred Return is to be distributed on a quarterly basis.

1.27 Profits and Losses. Profits and Losses means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, including gain or loss from Capital Transactions, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss:

(c) In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of "Depreciation";

(f) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's Member Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g) Any items which are specially allocated pursuant to Sections 4.05 or 4.06 shall not be taken into account in computing Profits and Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 4.05 shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

1.28 Required Vote. The affirmative vote of the Members entitled to vote other than the Manager having, in the aggregate, seventy-five percent (75%) of all of the Members entitled to vote other than the Manager, based on Member Percentages.

1.29 Reserves. Reserves shall mean, with respect to any fiscal period, funds set aside during such period that shall be maintained in amounts deemed sufficient by the Manager for working capital, to pay taxes, insurance, debt service, legal and accounting expenses, replacements, capital improvements or repairs, contingent liabilities, or other costs and expenses, incident to the ownership and enforcement of the Loan.

1.30 Stipulated Rate. The rate of interest, as determined by the Manager in its sole discretion, not to exceed the maximum interest rate allowable by law, calculated annually.

1.31 Terminating Capital Transaction. A sale, condemnation, exchange or other disposition, whether by foreclosure, abandonment or otherwise, of all or substantially all of the then remaining assets of the Company or a transaction that will result in a dissolution of the Company.

1.32 Transfer. The sale, transfer, assignment, syndication, pledge, hypothecation, encumbrance or other disposition, either voluntarily, involuntarily, by operation of law or otherwise.

1.33 Treasury Regulations or Regulations. The Regulations interpreting the Code promulgated by the United States Treasury Department.

1.34 Unpaid Preferred Return. As of any date, the Preferred Return that has been accrued but not paid to the Members (including the Manager).

1.35 Unreturned Capital. Unreturned Capital means, with respect to each Member (including the Manager), at any given time, the excess of (a) the Capital Contributions made by such Member to the Company, over (b) all distributions made to such Member pursuant to Subsection 4.01 (b) hereof.

## ARTICLE II
## FORMATION, NAME, BUSINESS, TERM

2.01 Formation. The Members hereby form the Company for the purposes set forth herein. The Members shall execute any and all certificates or other documents, and take whatever action is required, in order to authorize the Company to conduct business as a limited liability company under the Law. The rights and liabilities of the Members shall be as provided in the Articles and the Law, except as otherwise provided herein.

2.02 Name. The business of the Company shall be conducted under the name of the Company.

2.03 Principal Place of Business; Record Keeping Office. The principal place of business for the transaction of the business of the Company shall be at such location as hereinafter may be determined by the Manager.

2.04 Purposes of the Company. The Company is in the trade or business of making business purpose loans. The purpose for which the Company was organized is to make a business loan in the approximate aggregate amount of $3,000,000 (the "Loan") to Taryn Pisaneschi, LLC ("Borrower"). The Loan shall be evidenced by a two-year promissory note ("Note"), which is to be personally guaranteed by Taryn Pisaneschi. The Loan will be secured by a first mortgage (the "Mortgage") on the real property owned by the guarantor's parents Lawrence and Diane Kogan located at 6635 Sheffield Lane Miami Beach, FL 33141 and crossed collateralized with a second mortgage on property located at 6625 Brevity Lane Miami Beach, FL 33141 ("Property"). The Note, Mortgage, personal guarantees and other instruments executed in connection therewith are sometimes referred to herein as the "Loan Documents." The Company may, but shall not be obligated to, borrow funds and provide a security interest in the Loan Documents in connection therewith.

Without in any way limiting the generality of the foregoing, the Company is in the trade or business of making loans and the Company may: (i) enter into, perform and carry out contracts and agreements, or as may be necessary, appropriate or incidental to the accomplishment of the purposes of the Company; (ii) sell, convey, exchange, lease, mortgage or otherwise dispose of all or any part of the properties and assets of the Company for cash, stock, other securities or other property or any combination thereof; (iii) borrow money and evidence the same by notes or other evidences of indebtedness and secure the same with liens or pledges on all or any portion of the assets of the Company in furtherance of any of or all of the purposes

of the Company; and (iv) do all other acts and things that may be necessary, appropriate or incidental to the carrying out of the business and purposes of the Company

2.05 Scope and Jurisdiction. The Company is authorized to engage in all business permitted by the Law. If the Company qualifies to do business in a foreign jurisdiction, then it may transact all business permitted in that jurisdiction. There is no jurisdictional restriction upon the property or activity of the Company.

2.06 Term. The term of the Company as a limited liability company shall commence with the filing of the Articles, and shall continue in full force and effect until terminated in accordance with Article IX of this Agreement or as otherwise provided by the Law.

2.07 Title. Legal title to Company property, whether real, personal or mixed, shall be held in the name of the Company.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; LOANS

3.01 Initial Capital Contributions. Members have subscribed for Interests in the Company pursuant to an executed subscription agreement ("Subscription Agreement") and are admitted for such contributions to capital and in exchange for such Member Percentages as are set forth in the Subscription Agreement for each subscribing Member in its respective Subscription Agreement. The Subscribers shall contribute an aggregate of $3,000,000 in stages. The initial installment of the Capital Contributions of the Members, in the aggregate, shall be not less than $25,000 (the "Initial Capital Contribution"), payable simultaneous with each Member's subscription. Additional Capital Contributions shall be made upon three (3) business days' written notice by the Manager to the Members. The Manager, as the "Initial Member," shall be the sole Member of the Company until such time as the Subscribers are admitted as Members, and thereafter CBK Financial Solutions, LLC shall no longer have any interest in the Company as the Initial Member.

3.02 Additional Capital Contributions.

(a) Subject to the restrictions below, Additional Capital Contributions shall be required to be made by the Members as determined to be necessary by the Manager, including, by way of example, to protect the rights of the Company under the Loan Documents and to enforce the obligations of the Borrower thereunder, and to make payments under any debt incurred by the Company. Any such required additional Capital Contribution shall be made in proportion to each such Member's Member Percentage upon five (5) business days' written notice by the Manager to the Members.

(b) In the event that additional Capital Contributions are required pursuant to this Section (hereinafter referred to as the "Required Additional Capital Contribution") and any Member fails to make its Required Additional Capital Contribution ("Defaulting Member"), the other Members ("Lending Members") may, but shall not be obligated to, lend to the Company an

amount to satisfy the deficiency so created ("Default Loan"), which Default Loan shall be made in proportion to the Member Percentages of the Lending Members or as the Lending Members shall otherwise agree. The Default Loan shall be subject to the following terms: (i) such Default Loan shall be a demand loan that shall bear interest at the highest nonusurious rate permitted by law ("Default Rate"); (ii) all monies paid as repayment of such Default Loan shall first be applied to the costs and expenses of the Lending Member(s), including attorneys' fees and costs with respect to such Default Loan, secondly towards accrued and unpaid interest, and finally towards the outstanding principal balance; (iii) interest on the Default Loan shall be due and payable monthly and all such interest shall be paid by the Company, but shall be an obligation of the Defaulting Member and constitute a distribution to such Defaulting Member that shall be offset against any future distributions to which the Defaulting Member may otherwise be entitled to under this Agreement; and (iv) the Default Loan may be called in whole or in part anytime.

(c) In the event the Lending Members shall make the Default Loan and in the further event that the Defaulting Member shall have failed to fully cure the Default hereunder by paying the Default Loan, together with interest thereon at the Default Rate from the date such Default Loan was due until the date of the election by the Lending Members to take advantage of the provisions of this Section 3.02(c), the Lending Members shall have the right (which shall only be elected in writing) to convert all or any portion of the Default Loan (including interest that has accrued thereon) to the capital of the Company, whereupon the Member Percentages of the Lending Members shall be increased so that the net result is that the Member Percentages of the Lending Members shall be proportionately and permanently increased and the Member Percentages of the Defaulting Member shall be proportionately and permanently reduced in the manner set forth in Section 3.02(d) below. Notwithstanding anything contained herein to the contrary, the Lending Members shall give the Defaulting Member three (3) days' written notice of its intention to invoke the provisions of Section 3.02(d) below, during which time the Defaulting Member shall have the right to satisfy in full the then outstanding principal balance, together with any accrued but unpaid interest, of the Default Loan owing to the Lending Members.

(d) In the event that the Lending Members shall determine to convert all or any portion of the Default Loan to the capital of the Company pursuant to Section 3.02(c) above, the Member Interests of the Lending Members and the Defaulting Member shall be redetermined pursuant hereto so that the redetermined Member Percentage of the Lending Members shall be equal to a fraction, the numerator of which shall be equal to any Capital Contributions of the Lending Members, plus any Default Loans theretofore made by the Lending Member, and the denominator of which is equal to the sum of all of the Capital Contributions of all of the Members, plus the Default Loans theretofore made by the Lending Members. The redetermined Member Percentage of the Defaulting Member shall be an amount equal to the Member Percentage of the Defaulting Member decreased by the amount that the Member Percentage of the Lending Members was increased.

(e) The remedies heretofore expressly set forth are in addition to and not in lieu of any and all other legal and equitable remedies that may be available to the Company and/or the Lending Members in the event of a default by the Defaulting Member. With respect to the foregoing remedies, the Lending Members and the Company shall have the right to pursue

the same on a cumulative basis, and no action seeking any single remedy constituting an election or in any other way precluding the Lending Members or the Company from simultaneously or thereafter pursuing the other remedies.

3.03 Loans.

(a) Subject to the limitations provided herein, in the event that at any time or from time to time additional funds in excess of the Capital Contributions of the Members are required by the Company for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures, the Manager may, but shall not be obligated to, apply on behalf of the Company to borrow such required additional funds, with interest payable at the then prevailing rates, from commercial banks, savings and loan associations or other lending institutions. Any Member may, but is not required to, provide security or personal guarantees for such loans, in exchange for which such Member may be compensated in such amount as shall be agreed to by the Manager.

(b) In the event that the Manager is unable or chooses not to cause the Company to borrow said required additional funds from a commercial bank, savings and loan association or other lending institution, any Member (or an Affiliate of any Member) may, but is not required to, lend such funds to the Company. All Members shall be provided the opportunity to lend funds to the Company in proportion to its Member Percentage. In the event that a Member elects to provide the additional funds in the form of a loan to the Company, any such loan shall be evidenced by a negotiable promissory note of the Company and shall bear interest at a rate per annum agreed upon by the lending Members and the Manager. In no event shall any such loan bear interest at a rate in excess of the highest lawful nonusurious rate permitted by the law applicable to the loan. Any interest paid pursuant to this Paragraph shall be deemed an expense of the Company and repayment of such loan(s) shall not affect the Capital Account of the Member. All loans made by a Member shall be and are hereby declared to be secured by a lien or pledge upon the assets of the Company, subject only to any prior liens granted to third party lenders. This provision is not intended to be for the benefit of any creditor or other Member (other than a Member in its capacity as a Member) to whom any debts, liabilities or obligations are owed by the Company or any of the Members.

3.04 Other Matters Relating to Capital and Loans.

(a) Interest earned on Company funds shall inure solely to the benefit of the Company, and, except as specifically provided herein, no interest shall be paid upon any contributions or advances to the capital of the Company or upon any undistributed or reinvested income or profits of the Company.

(b) The Capital Contributions of the Members shall be utilized for carrying out the purposes of the Company as set forth in this Agreement and for payment of any expenses incurred in connection therewith, including payment or reimbursement of expenses paid or incurred on behalf of the Company whether prior or subsequent to the execution of this Agreement.

(c) Loans by a Member to the Company (including those arising by virtue of payment under a guaranty or indemnity of the Company obligations) shall not be considered contributions to the capital of the Company and shall not increase the Capital Account of the lending Member.

(d) Except as specifically provided herein, no Member shall be entitled to withdraw its Capital Contribution, or to a return of any part of his Capital Contribution or to receive property or assets other than cash in return thereof without the consent of the Manager, and the Manager shall not be liable for the return of all or any portion of the Members' Capital Contributions.

(e) No Member shall be entitled to priority over any other Member, either with respect to a return of his Capital Contribution or to allocations of taxable income, gains, losses or credits, or to distributions, except as provided in this Agreement.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.01 Distribution of Available Cash. Available Cash shall be distributed to the Members at such time as determined by the Manager as follows:

(a) First, to the Members pro rate in accordance with their respective Unpaid Preferred Returns, until the Unpaid Preferred Return of the Members, if any, is reduced to zero;

(b) Second, to the Members pro rata in accordance with their respective Unreturned Capital balances, until the Unreturned Capital balances of all of the Members, if any, is reduced to zero; and

(c) Finally, (i) eighty percent (80%) to the Members, pro rata in accordance with their respective Member Percentages, and (ii) twenty percent (20%) to the Manager.

4.02 Distribution of Net Proceeds from Terminating Capital Transactions. Net Proceeds from Terminating Capital Transactions shall be distributed to the Members in accordance with the provisions of Section 9.02 hereof.

4.03 Allocations of Profits and Losses. Profits and Losses shall be allocated in the following order of priority:

(a) Any Profits shall be allocated as follows:

(i) first, to the Members in an amount equal to and in proportion to the net cumulative Losses (aggregate Losses in excess of aggregate Profits) allocated to the Members since the date of this Agreement;

(ii) next, to the Members in proportion and in an amount equal to the amounts distributed pursuant to Sections 4.01(a) and 9.02(a)(iv) hereof;

(iii) finally, (A) eighty percent (80%) to the Members, pro rata in accordance with their respective Member Percentages, and (B) twenty percent (20%) to the Manager.

(b) Any Losses shall be allocated:

(i) first, to the Members in an amount equal to and in proportion to the net cumulative Profits (aggregate Profits in excess of aggregate Losses) allocated to the Members subsequent to the date of this Agreement;

(ii) next, to the Members pro rata in accordance with their respective positive Capital Account balances; and

(iii) thereafter, (A) eighty percent (80%) to the Members, pro rata in accordance with their respective Member Percentages, and (B) twenty percent (20%) to the Manager.

4.04. Special Allocations. The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Regulations, and notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-20)(2) of the Regulations. This Section is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations and notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5)of the Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member

pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-20)(2). This Section is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c) Qualified Income Offset; Loss Limitation.

(i) If any Member unexpectedly receives any adjustment, allocation, or distribution described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases a deficit capital account balance in such Member's Capital Account (as determined in accordance with such Regulations), items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that such allocations shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section were not in the Agreement. This provision is intended to be a "qualified income offset," as defined in Regulation Section 1.704-1(b)(2)(ii)(d), such Regulations being specifically incorporated herein by reference.

(ii) The Losses allocated pursuant to Section 4.03 hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.04, the limitation set forth in this Subsection shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Regulations.

(d) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IV have been made as if Section 4.05(c) hereof and this Section were not in this Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated based upon their respective Member Percentages.

(f) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.7042(i)(1).

(g) Excess Nonrecourse Liabilities. Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are based upon their respective Member Percentages.

(h) Distributions with Respect to Nonrecourse Liabilities. To the extent permitted by Section 1.704-2(h)(3)of the Regulations, the Manager shall endeavor to treat distributions of Available Cash as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

(i) Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

4.05. Curative Allocations. The allocations set forth in Section 4.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section. Therefore, notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.03.

4.06. Tax Allocations:

(a) In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) of the definition of "Gross Asset Value").

(b) In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of "Gross Asset Value," subsequent allocations of

income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c) Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distribution pursuant to any of this Agreement.

(d) Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the Fiscal Year.

4.07. Other Allocation Rules.

(a) Profits, Losses and any other items of income, gain, loss or deduction shall be allocated to the Members pursuant to this Article IV as of the last day of each Fiscal Year; provided that Profits, Losses and such other items shall also be allocated at such times as the Gross Asset Values of Company property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(c) All allocations to the Members pursuant to this Article IV shall, except as otherwise provided, be divided among them in proportion to the Member Percentages held by each.

(d) The Members are aware of the income tax consequences of the allocations made by this Article IV and hereby agree to be bound by the provisions of this Article IV in reporting their shares of Company income and loss for income tax purposes, except to the extent otherwise required by law.

4.08. Allocations to Transferred Interests. Profits and Losses that are allocable to a Member Interest that was transferred or assigned during a Fiscal Year shall be further allocated between or among the transferor and transferee Members in proportion to the number of days during the Fiscal Year that each such Member owned said Member Interest or in any other proportion authorized by the Code and selected by the Manager, without regard to the actual Profits and Losses as of the date of such transfer or assignment and without regard to any distributions made with respect to such Member Interest.

4.09. Withholding for Taxes. Notwithstanding anything to the contrary contained herein, the Company shall have the power and authority to withhold from distributions to the Members such amounts as may be required to be withheld and remitted for federal or state income tax purposes.

## ARTICLE V
## MANAGEMENT OF THE COMPANY

5.01 Rights, Powers and Duties of the Manager. The overall management and control of all aspects of the business and operations of the Company shall be vested exclusively in the Manager. The Manager shall have all the rights and powers provided in this Agreement, the Law and the Articles and any action taken by the Manager shall constitute the act of and serve to bind the Company. The Manager shall conduct the day-to-day operations of the Company and shall use good faith efforts to carry out the business of the Company as set forth herein. With respect to all of its obligations, powers and responsibilities and the limitations thereon as provided in this Agreement, the Manager is authorized to execute and deliver, for and on behalf of the Company, such agreements or instruments as the Manager may deem necessary or desirable, all on such terms and conditions as it may deem necessary or desirable, and the execution of such agreements, instruments or other documents by the Manager shall be sufficient to bind the Company. Without limiting the generality of the foregoing, the Manager has the right, power and authority, on behalf of the Company, to:

(a) Execute, on behalf of the Company, any and all Loan Documents and other agreements, contracts, documents, certificates and instruments necessary or convenient in connection with the Loan, and make decisions with respect to the Loan (including any waivers, extensions or other elections of the lender thereunder), including issuing instructions to the escrow agent under the Subscription Agreements to release the Capital Contributions of the Members to the Company;

(b) Enter into any financing or refinancing arrangements with respect to the Loan, and execute security instruments in connection therewith, including but not limited to debt secured by the Loan Documents;

(c) Employ such agents, employees, managers, accountants, attorneys, consultants and other professionals as it may deem necessary or desirable for the conduct of the Company's business and pay from Company assets such fees, expenses, salaries, wages and other compensation to such parties as it may determine;

(d) Pay from Company assets, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise upon such terms as it may determine, and upon such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim. including taxes. either in favor of or against the Company;

(e) Make from Company assets any and all expenditures that it may deem necessary or desirable for the conduct of the Company's business and the carrying out of its

obligations and responsibilities under this Agreement to the extent permissible under any other agreements (including mortgages) to which the Company is a party;

(f) Declare and make distributions of capital or income, in cash or property, to Members;

(g) Subject to the provisions of Article VII, admit Persons as Members, including substituted Members;

(h) Purchase liability and other insurance to protect the Company and the Company's assets and business;

(i) Invest the Company's assets in bank and savings and loan association savings accounts, commercial paper, government securities, certificates of deposit, bankers' acceptances, other short term interest bearing obligations and any other investments in the sole and absolute discretion of the Manager;

(j) Maintain adequate records and accounts of all operations and expenditures and furnish the Members with annual statements of accounts as of the end of each Company Fiscal Year, together with tax reporting information;

(k) Make, refrain from making, or revoke such elections under the tax laws of the United States, the several States and other relevant jurisdictions as to the treatment of items of Company income, gain, loss, deduction, and credit and as to all other relevant matters, including, without limitation, elections under Section 754 of the Code;

(l) Sell and convey any real property owned and held by the Company;

(m) Redeem Member Interests of the Members and admit Members on such terms and conditions as the Manager shall determine; and

(n) Take any and all other action permitted under the Law and that is reasonably related to Company purposes.

5.02 Liability and Indemnification of Manager.

(a) Neither the Manager nor its officers, directors, partners, employees, agents, Affiliates, successors or assigns shall be liable to the Company or the Members for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company, unless such act or omission was taken or omitted by the Manager, in bad faith, and such act or omission constitutes fraud, gross negligence or willful breach of fiduciary duty.

(b) The Company, its receiver or its trustee, shall indemnify and save harmless the Manager and its officers, directors, partners, employees, agents, Affiliates, successors and assigns, including any guarantors of Company obligations (each of the foregoing being a "Covered Person"), from any claim, liability, loss, judgment or damage incurred by them

by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage provided that the act or omission of the Covered Person is not found, by a final, non-appealable ruling of a court of competent jurisdiction to have resulted from an act or omission of the Covered Person taken in bad faith and that constitutes fraud, gross negligence or willful breach of fiduciary duty by the Covered Person. The Company shall advance all sums required to indemnify and hold each Covered Person harmless as provided herein from the initiation of any claim against such Covered Persons, subject to acknowledgment in writing by such Covered Person of the obligation to reimburse the Company in the event that, following the entry of a final, non-appealable judgment, it is determined that the Company was not obligated to indemnify such Person pursuant to this Agreement. All judgments against the Company and a Covered Person, wherein the Covered Person is entitled to indemnification, must first be satisfied from Company assets before the Covered Person shall be responsible for such obligations. The Company shall not pay for any insurance covering liability of a Covered Person for actions or omissions for which indemnification is not permitted hereunder; provided, that nothing contained herein shall preclude the Company from purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person owning comparable property and engaged in a similar business or from naming the Manager and any Covered Person as additional insured parties thereunder. The provisions of this Section shall survive the termination of the Company.

5.03 Contractual Provisions. The Manager shall have the right and authority to require a provision in all Company contracts that it not be personally liable thereon and that the person or entity contracting with the Company is to look solely to the Company and its assets for satisfaction.

5.04 Delegation of Duties. The Manager shall have the right and authority to delegate to one or more persons (including, but not limited to, delegation among the Managers) the Manager's right and powers to manage and control the businesses, investments and affairs of the Company, including delegating to agents, employees and Affiliates of the Manager or Company.

5.05 Compensation of Manager and Affiliates.

(a) The Manager shall be reimbursed for any cost or expense it may have incurred on behalf or for the benefit of the Company. If funds are not available from financing or operations to pay the costs as herein specified, any unpaid costs shall be deemed a loan by the Manager to the Company at the Stipulated Rate payable before other Distributions of Available Cash to the Partners.

(b) The Manager or its designated Affiliates shall be entitled to be compensated by the Company for the following: (i) a loan origination fee equal to two percent (2 %) of the face amount of the Loan; and (ii) an asset management fee equal to an annual rate of two percent (2%) of the outstanding principal balance of the Loan (including accrued but unpaid interest thereon) calculated as of the last day of each month, payable monthly. Nothing contained

herein shall preclude the Manager or its Affiliates from receiving distributions pursuant to Articles IV or IX herein.

5.06 Other Activities. The Manager and its respective Affiliates may have other business interests and may engage in other activities in addition to those relating to the Company, including, without limitation, the rendering of advice or services of any kind to other investors, the making of other investments and serving as a general partner, managing member or in similar capacities in other partnerships or entities of any kind. The pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

5.07 Transactions with Affiliates. The validity of any transaction, agreement or payment involving the Company, on the one hand, and the Manager or its Affiliates, on the other hand, permitted by the terms of this Agreement shall not be affected by reason of the relationship between the Company and the Manager or its Affiliates; provided, however, that in all events such agreements shall be on the same or similar terms available to the Company if it was to contract with an unaffiliated third party similarly situated.

5.08 Removal of the Manager.

(a) The Required Vote of the Members may cause, without the consent of the Manager, the removal of a Manager from the Company upon the occurrence of any of the following events:

(i) entry of a final, non-appealable judgment by a court of competent jurisdiction to the effect that the Manager was liable for intentional misconduct, gross negligence or fraud under the provisions of this Agreement; or

(ii) entry of a final, non-appealable judgment by a court of competent jurisdiction to the effect that the Manager has willfully breached a material provision of this Agreement and/or failed to comply with its covenants and agreements contained in this Agreement, and such breach or failure is not cured within a period of thirty (30) days after entry of such judgment.

(b) Upon removal of the Manager and selection of a successor Manager as provided herein, the removed Manager shall immediately cease to have any authority to act as a Manager for the Company. Any of the Company funds or other property in the possession or under the control of such removed Manager shall immediately be released and transferred to its successor. The removed Manager shall cooperate in the orderly transition of affairs to its successor. The indemnification provisions of Section 5.02 shall survive the removal of a Manager.

5.09 Election of Successor Manager. Within ninety (90) days after the removal, adjudication of bankruptcy or insolvency of the Manager, if there is not another Manager then serving, the Members (other than the Terminated Manager) by Required Vote may elect to

continue the business of the Company and, if they desire to do so, they must elect a successor Manager.

## ARTICLE VI
## MATTERS REGARDING MEMBERS

6.01 Liability and Indemnification of Members.

(a) Except as provided above and in Article III hereof, the Members shall not be bound by, or personally liable for, obligations or liabilities of the Company beyond the amount of their initial Capital Contributions and any Required Additional Capital Contributions to the Company; provided, however, the Members may be obligated under applicable state law to return a distribution from the Company to the extent required under the Law if, immediately after giving effect to the distribution, the Company is not able to pay its debts as they come due in the ordinary course of business, or if the Company's total assets would be less than its liabilities.

(b) Neither the Members nor their officers, directors, partners, employees, agents, affiliates, successors or assigns shall be liable to the Company or the other Members for any loss or damage incurred by reason of any act performed or omitted in connection with the activities of the Company or in dealing with third parties on behalf of the Company, unless such act or omission was taken or omitted by the Member, in bad faith, and such act or omission constitutes fraud, gross negligence or willful breach of fiduciary duty.

(c) The Company, its receiver or its trustee, shall indemnify and save harmless each Member and their respective officers, directors, partners, employees, agents, Affiliates, successors and assigns, from any claim, liability, loss, judgment or damage incurred by them by reason of any act performed or omitted to be performed in connection with the activities of the Company or in dealing with third parties on behalf of the Company, including costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage provided that the act or omission of the Member is not found, to have resulted from an act or omission of the Member taken in bad faith and that constitutes fraud, gross negligence or willful breach of fiduciary duty by the Member. The Company shall advance all sums required to indemnify and hold the Member and its Affiliates harmless as provided herein from the initiation of any claim against such indemnified Persons, subject to acknowledgment in writing by such indemnified Person of the obligation to reimburse the Company in the event that it is determined that the Company was not obligated to indemnify such Person pursuant to this Agreement. All judgments against the Company and a Member, wherein the Member is entitled to indemnification, must first be satisfied from Company assets before the Member shall be responsible for such obligations. The Company shall not pay for any insurance covering liability of the Member or of its officers, directors, partners, employees, agents, Affiliates, successors and assigns for actions or omissions for which indemnification is not permitted hereunder; provided that nothing contained herein shall preclude the Company from purchasing and paying for such types of insurance, including extended coverage liability and casualty and worker's compensation, as would be customary for any person owning comparable property and engaged in a similar business or from naming the

Member and any of its Affiliates as additional insured parties thereunder. Nothing contained herein shall constitute a waiver by any Member of any right which he may have against any party under Federal or state securities laws. The provisions of this Section shall survive the termination of the Company.

6.02 Management. The Members shall not participate in the operation or management of the business of the Company, or transact any business for or in the name of the Company.

6.03 Limitation of Certain Rights. The Members shall not have the right or power to: (a) withdraw or reduce their Capital Contributions to the Company except as a result of the dissolution of the Company or as otherwise provided in this Agreement or by the Law; (b) bring an action for partition against the Company or with respect to any of its property; (c) compel any sale of all or any portion of the assets of the Company pursuant to any applicable law, (d) cause the appointment of a receiver for all or any portion of the assets of the Company, or (e) cause the termination or dissolution of the Company by court decree or as may be permitted by the Law, such rights being specifically waived by the Members. Each Member has been induced to enter into this Agreement in reliance upon the waivers set forth in this Section, and without those waivers, no Member would have entered into this Agreement.

6.04 Voting. Whenever the Members are entitled by this Agreement to vote on any particular matter, each Member shall be entitled to vote in proportion to the Member Percentage of such Member. Except as specifically provided to the contrary herein, all actions of the Members shall be authorized by Required Vote of the Members.

6.05 Meetings of the Members.

(a) Meetings of the Members for any purpose may be called by the Manager, and shall be called by the Manager upon receipt of a request in writing signed by the Required Vote of the Members. Such request shall state the purpose or purposes of the proposed meeting and the business to be transacted. Notice of any such meeting shall be delivered to all Members in the manner prescribed in Section 10.02 of this Agreement within ten (10) days after receipt of such request and no fewer than fifteen (15) days or more than sixty (60) days before the date of such meeting. The notice shall state the place, date, hour and purpose of the meeting. Members may participate telephonically. At each meeting the Members present or represented by proxy shall adopt such rules for the conduct of such meeting as they shall deem appropriate. A list of the names and addresses of all Members shall be maintained as part of the books and records of the Company.

(b) The presence in person or by proxy of the Required Vote of the Members shall constitute a quorum at all meetings; provided, however, that if there be no such quorum, Members (or their proxies) holding more than fifty (50%) percent of the Member Percentages of the Members at such meeting may adjourn the meeting from time to time without further notice, until a quorum shall be obtained.

(c) Each Member may authorize any person or persons to act for him by proxy in all matters in which a Member is entitled to participate. Every proxy must be signed by

the Member or his attorney-in-fact (other than the Manager). No proxy shall be valid after the expiration of six (6) months from the date thereof. Every proxy shall be recoverable and rescindable (if rescinded prior to any vote) by the Member executing it.

6.06 Special Power of Attorney.

(a) Each Member, by his execution of the Member's signature page to this Agreement, irrevocably makes, constitutes and appoints the Manager, with full power of substitution, their true and lawful attorney-in-fact, for them and their names, places and steads, to make, execute, sign, acknowledge, swear to, deliver, record and file any document or instrument which may be considered necessary or desirable by the Manager to carry out the provisions of this Agreement, including, without limitation, the following:

(i) To issue instructions to any escrow agent holding subscriptions for Capital Contributions to the Company from such Member upon fulfillment of any of the conditions to release, including at the closing on the transaction for which the Company has been organized as set forth in Section 2.04 hereof;

(ii) Any amendment to this Agreement made with such consents, if any, of the Members as provided herein, any separate certificate of membership, any certificate of doing business under any assumed name, and any other certificate, instrument or document which may be required to be filed, or which the Manager deems advisable to file, under the laws of any state or the regulations of any governmental agency, as well as any amendments to the foregoing; and

(iii) Any instrument or document which may be required or appropriate to carry out the purposes of the Agreement, effect the continuation of the Company, approve the choice of and admit any additional or substituted Member, dissolve and terminate the Company, or consent to the return to the Members of all or a part of their respective Capital Contributions by reason of Distributions to the Partners, or as may be required or helpful to effectuate a transaction approved by the Required Vote of the Members pursuant to Section 7.06 hereof.

(b) The foregoing special power of attorney granted by each Member shall be one which:

(i) Is a special power of attorney coupled with an interest, is irrevocable and shall survive the death or legal incapacity of the granting Member.

(ii) May be exercised by the Manager for each Member by a facsimile signature or by executing any instrument with a single signature as attorney-in-fact for all Members; and

(iii) Shall survive the delivery of any attempted assignment by a Member of any part of his Member Interest, except that where the assignee has been approved by the Manager for admission to the Company as a substituted Member, this special power shall

survive the delivery of such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument or document necessary to effect such substitution.

6.07 Manager's Ownership of Member Interests. In the event that the Manager shall own any Member Interest, the Manager shall in all respects be treated as a Member with respect to the Member Interest owned by the Manager.

6.08 No Priority. Except as otherwise specifically set forth herein, no Member shall have the right to demand or receive property other than cash in any distribution. Except as otherwise specifically set forth herein, no Member shall have priority over any other Member.

## ARTICLE VII
## ISSUANCE AND TRANSFERS OF MEMBER INTERESTS

7.01 Prohibition. Except as provided in this Article VII, absent the written consent of the Manager, no Member shall Transfer all or any portion of its Member Interest or any interest or right therein. Any purported Transfer of a Member Interest in violation of the provisions of this Agreement shall be void ab initio. Notwithstanding the foregoing, a Member shall have the right to Transfer its Member Interest for estate planning purposes to, in trust for the benefit of, or to an entity wholly-owned by, the Member or the family members of the Member.

7.02 Rights of Assignee. For purposes of this Agreement, an "Assignee" is any Person who acquires (by purchase, gift, inheritance, judgment or otherwise), or claims to have an ownership or security interest (including any charging lien) in or against the Company or any Member Interest, but who has not been admitted as a Member of the Company in accordance with Section 7.03. Any interest in the Company or any Member Interest acquired by an Assignee is subject to the terms and conditions of this Agreement and the Articles. An Assignee has no rights or entitlements in respect to the Company or any Member Interest except as specifically granted to the Assignee in this Agreement or the Articles. By way of illustration and not limitation, an Assignee shall have no (i) voting rights of any nature or kind, or (ii) rights to require any information or accounting of the Company's transactions or finances or to inspect Company books. If, however, an Assignee is admitted to the Company as a Member, such admission shall vest in such Assignee all rights, powers, authorities and responsibilities inuring to and imposed upon Members hereunder.

7.03 Additional Member Interests; Admission of Members.

(a) No additional Members shall be admitted into the Company without the prior written consent of the Manager, which consent shall not be unreasonably withheld. Any additional Member admitted into the Company shall be admitted upon such terms and conditions as determined by the Manager and in compliance with the provisions of this Agreement. Additional Members shall agree in writing to be bound by this Agreement.

(b) An Assignee will be admitted to the Company as a successor or additional Member only if all of the following conditions are met:

(i) The Manager consents in writing to the admission of the Assignee as a Member, provided that, without limiting the generality of the foregoing, it shall not unreasonable for the Manager to withhold consent with respect to an Assignee if consenting would: (A) permit access to the business and affairs of the Company to a Person that is in competition with or, in the good faith opinion of the Manager; would be detrimental to the best interests of the Company or would be restricted by any applicable loan documents; (8) subject the Company to investment or other legal restrictions to which it would otherwise not be subject; or (C) permit a Person, who is not an "Accredited Investor" (as defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Act")) to be a Member;

(ii) The Assignee agrees in writing to be bound by the provisions of this Agreement.

(iii) The Assignee delivers to the Manager documentation, satisfactory to Manager, evidencing Assignee's right to an interest in the Company or a Member Interest, and execute any and all documents, including an amendment to this Agreement, required to effectuate or evidence its admission to the Company as a Member;

(iv) The Assignee reimburses the Company for all reasonable costs and expenses (including reasonable attorney's fees) incurred in connection with the transfer and admission;

(v) The Assignee is not a minor or legally incompetent;

(vi) The Transfer does not constitute a default under any agreement to which the Company or Assignee is bound; and

(vii) If deemed necessary by the Manager, an opinion of counsel is delivered to the Manager in form, substance and from counsel satisfactory to the Manager to the effect that: (A) the proposed Transfer does not require registration under the Act or any other applicable state or federal securities laws, including, in each case, the rules and regulations promulgated thereunder; and (8) that such action will not cause the Company to be termination for federal income tax purposes pursuant to Code Section 708.

7.04 <u>Rights of Individual Member's Personal Representative</u>. Upon the death or disability of an individual who is a Member, his personal representative shall have all of the rights of a Member for the purpose of settling or managing his estate, and such power as the decedent or incompetent possessed to constitute a successor as an Assignee and to join with such assignee in making application to substitute such Assignee as a Member. However, such personal representative shall not have the right to become a substituted Member in the place of his predecessor in interest unless the conditions of Section 7.03 (other than the requirement that the assignor execute and acknowledge instruments) are satisfied.

7.05 Rights of Nonindividual Member's Representative. Upon the adjudication of bankruptcy, dissolution or other cessation of existence as a legal entity of a Member which is not an individual, the authorized representative of such entity shall have all of the rights of a Member for the purpose of effecting the orderly Winding-up and disposition of the business of such entity and such power as such entity possessed to constitute a successor as an Assignee and to join with such Assignee in making application to substitute such assignee as a Member.

7.06 Sale or Conversion of Company. In lieu of selling all or substantially all of the assets of the Company, the Manager may arrange a transaction pursuant to which the interests of the Manager and the Members in the Company shall be acquired by a Person in exchange for cash, property (including an equity interest in such Person or its Affiliate), or any combination of the foregoing or the Company shall be converted into a different form of entity. If the Manager arranges such a transaction and, following not less than twenty (20) days' prior written notice to the Members describing the material terms thereof, the transaction is approved by the Required Vote of the Members, the same shall be deemed an Approved Transaction for purposes of this Section. In the event of an Approved Transaction, each Member, whether or not it voted for the Approved Transaction, agrees (i) to raise no objection to the consummation of the Approved Transaction; (ii) if the Approved Transaction is structured as a merger, consolidation or other transaction to which such rights would be applicable, hereby waives any dissenters, appraisal or similar rights in connection therewith; (iii) agrees to convey its interest in the Company as contemplated by the Approved Transaction; and (iv) agrees to take such other actions and to execute such documents as shall be deemed necessary or desirable by the Manager in connection with the entering into and consummation of the Approved Transaction. Each Member shall, in connection with the Approved Transaction, receive in exchange for its interest in the Company the same consideration as such Member would have received if the aggregate consideration paid with respect to the entire Approved Transaction had been received by the Company and distributed in complete liquidation pursuant to the rights and preferences set forth in this Agreement.

## ARTICLE VIII
## FISCAL MATTERS

8.01 Books and Records. The Manager shall keep, or cause to be kept, full and accurate books and records of all transactions of the Company using such method of accounting as determined by the Manager in consultation with the Company accountants. All organizational records of the Company and other records required to be kept by the Company under the Law, shall, at all times, be maintained at the Company's record keeping office, and shall be open during ordinary business hours for inspection and copying upon the reasonable request and at the expense of the Members and their authorized representatives.

8.02 Reports and Statements.

(a) Within ninety (90) days after the end of each Fiscal Year, the Company shall, at its expense, cause to be delivered to the Members the following unaudited financial

statements, which obligation may be satisfied by delivery to the Members of a copy of the Company's federal tax return:

(i) A profit and loss statement for such period; and

(ii) A balance sheet of the Company as of the end of such period.

(b) The Manager shall, at the expense of the Company prepare, or cause to be prepared, for delivery to the Members prior to the due date thereof (excluding extensions), all federal and any required state and local income tax returns for the Company for each Fiscal Year of the Company.

8.03 Appointment of Tax Matters Partner. The Manager is hereby designated pursuant to Code Section 6231 (a)(7) as the Company's Tax Matters Partner, and is responsible for acting as the liaison between the Company and the Internal Revenue Service ("Service"). The Tax Matters Partner shall have the duties of a tax matters partner as provided in the Code, in addition to such other duties as are provided under this Agreement. The Tax Matters Partner shall be reimbursed by the Company for all out-of-pocket expenses, costs and liabilities expended or incurred by the Tax Matters Partner in acting as the Company's Tax Matters Partner.

8.04 Tax Status. Any provision hereof to the contrary notwithstanding, solely for United States federal income tax purposes, each of the Members hereby recognizes that the Company will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code. The parties intend that the Company be taxed as a partnership for United States income tax purposes. The parties intend that all special allocations be considered to have economic effect under the "qualified income offset" provisions described in section 1.704-1(b)(2)(ii)(d) of the Regulations. All questions of construction and interpretation shall be resolved consistently with that intent.

8.05 Tax Elections. The Members shall from time to time determine whether or not to make or attempt to revoke any and all tax elections regarding depreciation methods and recovery periods, capitalization of construction period expenses, amortization of organizational and startup expenditures, basis adjustments upon admission or retirement of Members, and any other federal, state, or local income tax elections.

## ARTICLE IX
## DISSOLUTION

9.01 Dissolution. The Company shall be dissolved only upon the occurrence of any of the following:

(a) The sale of all or substantially all of the assets of the Company;

(b) The written election by the Manager and the Required Vote of the Members that the Company should be dissolved; or

(c) The date on which the Company is required to be dissolved under the Law.

9.02 Wind-Up of Affairs.

(a) Upon dissolution, the Manager shall proceed with dispatch and without any unnecessary delay to sell or otherwise liquidate the Company's assets. The Capital Account of each Member shall be determined. Profits or Losses to the date of termination, including realized profits or losses arising from a sale of all of the assets of the Company (whether or not recognized for Federal income tax purposes), and unrealized profits and losses on any assets to be distributed in kind (determined as if such assets had been sold by the Company for prices equal to their respective fair market value) shall be allocated as set forth in Article IV and credited or charged to the Capital Accounts of the Members. After paying or duly providing for all liabilities to creditors of the Company, the Manager shall distribute the net proceeds and any other liquid assets of the Company among the Members in the manner hereinafter set forth:

(i) First, to the expenses of any such sale or disposition;

(ii) Next, to the payment of just debts and liabilities of the Company (including all amounts of any principal or interest payable with respect to any loans from Members), in the order of priority as provided by the Law;

(iii) Next, to the establishment of any Reserves that the Manager may deem reasonably necessary for any contingent or unforeseen liabilities and other obligations of the Company or of the Members or any guarantors of Company obligations arising out of or in conjunction with the Company's affairs;

(iv) Next, to those Members having an Unpaid Preferred Return, pro rata in accordance with their respective Unpaid Preferred Return, until the Unpaid Preferred Return of the Members, if any, is reduced to zero; and

(v) Finally, to the Members, an amount equal to their then existing positive Capital Account balances, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which such liquidation occurs.

(b) The wind-up of the affairs of the Company shall be conducted exclusively by the Manager. In liquidating the assets of the Company, all tangible assets of a saleable value shall be sold at such price and terms as the Manager in good faith determines to be fair and equitable. Any partnership, corporation or other entity in which all or any of the Members are in any way interested may purchase such assets at such sale. It shall not be necessary to sell any intangible assets of the Company. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Company to minimize the losses normally occurring upon a liquidation.

(c) If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the then fair market value thereof (after adjusting the Capital Accounts of all Members for any unrealized gain or loss inherent in such property, as set forth above). The fair market value shall be determined by the Manager, or, if requested by the Members, by an independent appraiser who shall be selected by agreement of the Manager and the Required Vote of the Members. In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Article IX may be:

(i) Distributed to a trust established for the benefit of the Members solely for the purposes of liquidating Company property, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Manager in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Article IX; or

(ii) Withheld to provide a reasonable Reserve for Company liabilities (contingent or otherwise) and to allow for the collection of the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable

(d) The portion of the distributions that would otherwise have been made to each of the Members that is instead distributed to a trust or withheld to provide a Reserve pursuant hereto shall be determined in the same manner as the expense or deduction would have been allocated if the Company had realized an expense equal to such amounts immediately prior to Distributions being made pursuant to this Article IX.

9.03 Termination. The Company shall terminate when all Company assets shall have been disposed of.

## ARTICLE X
## MISCELLANEOUS

10.01 Amendments. This Agreement may be amended at any time with written consent of, in each case, the Manager and (a) the Required Vote of the Members in every instance other than those described in clauses (b) and (c); (b) if an amendment affects a Member's obligations to make Capital Contributions or a Member's allocable share of Profits and Losses or share of distributions, then the consent of such Member shall be required; and (c) without the consent of any of the Members if the amendment is (i) to substitute or add Members to the extent provided for in this Agreement and to amend Schedule A, as appropriate from time to time, to accurately reflect the identity of each Member; (ii) to add to the representations, duties or obligations of the Manager or surrender any right or power granted to the Manager herein, for the benefit of the Members; (iii) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the

provisions of this Agreement; (iv) to preserve the status of the Company as a "partnership" for federal income tax purposes; (v) to delete or add any provision of this Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission or other federal agency or by a state securities commission or official or similar such official, which addition or deletion is deemed by such commission, agency or official to be for the benefit or protection of the Members; or (vi) if such amendment is, in the opinion of counsel for the Company, necessary or appropriate to satisfy the requirements of Code Section 704(b) or the regulations promulgated thereunder. If amended, the Manager shall file, or cause to be filed, an amendment of the Articles of Organization with the appropriate authorities, in the event that the Manager determines the filing of such amendment to be necessary or appropriate to comply with the Law.

10.02 Notices. Any notice required or permitted to be delivered to any Member under the provisions of this Agreement shall be deemed to have been duly given (a) upon hand delivery thereof, (b) upon telefax and written confirmation of transmission, (c) upon receipt of any overnight deliveries, or (d) on the fifth (5th) business day after mailing United States registered or certified mail, return receipt requested, postage prepaid, addressed to each Member as set forth on Schedule A hereto or at such other address, or to such other Person and at such address for that Person, as any Member shall designate in writing to the other Members in the manner hereinabove set forth.

10.03 Agency. Except as provided herein, nothing herein contained shall be construed to constitute any Member hereof the agent of any other Member hereof or to limit in any manner the Members in the carrying on of their own respective businesses or activities. Any Member may engage in and/or possess any interest in other business ventures of every nature and description, independently or with others, whether existing as of the date hereof or hereafter coming into existence; and neither the Company nor any Member hereof shall have any rights in or to any such independent ventures or the income or profits derived therefrom.

10.04 Further Assurances. The Members will execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

10.05 Headings. The headings of the various sections of this Agreement are intended solely for convenience of reference, and shall not be deemed or construed to explain, modify or place any construction upon the provisions hereof.

10.06 Successors and Assigns. This Agreement and any amendments hereto shall be binding upon and, to the extent expressly permitted by the provisions hereof, shall inure to the benefit of the Members, their respective heirs, legal representatives, successors and assigns.

10.07 Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations of the jurisdictions in which the Company does business.

10.08 Entire Agreement. This Agreement sets forth all (and is intended by all parties hereto to be an integration of all) of the promises, agreements, conditions, understandings, warranties and representations among the parties hereto with respect to the Company, the Company business and the Company assets, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied. except as set forth herein.

10.09 Counterparts. This Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed an original, and such counterparts shall constitute but one and the same instrument. Facsimile and PDF signatures may be relied upon as originals.

10.10 Gender. Wherever the context requires, any pronoun used herein may be deemed to mean the corresponding masculine, feminine or neuter in form thereof and the singular form of any nouns and pronouns herein may be deemed to mean the corresponding plural and vice versa as the case may require.

10.11 Remedies. Each of the Members acknowledges and agrees that in the event that a Member shall violate any of the restrictions or fails to perform any of the obligations hereunder, the Company or the other Members will be without adequate remedy at law and will therefore be entitled to enforce such restrictions or obligations by temporary or permanent injunctive or mandatory relief obtained in an action or proceeding instituted in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other remedies it may have at law or in equity.

10.12 Litigation. If the Company or any party hereto is required to engage in litigation against any other party hereto, either as plaintiff or as defendant, in order to enforce or defend any rights under this Agreement, and such litigation results in a final judgment in favor of such party ("Prevailing Party"), then the party or parties against whom said final judgment is obtained shall reimburse the Prevailing Party for all direct, indirect or incidental expenses incurred, including, but not limited to, all attorneys' fees, court costs and other expenses incurred throughout all negotiations, trials or appeals undertaken in order to enforce the Prevailing Party's rights hereunder.

10.13 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person shall have any rights, interest or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

10.14 No Recordation. Neither this Agreement nor any memorandum thereof shall be recorded amongst the public records of any governmental authority without the prior written consent of the Manager.

10.15 Foreign Person Withholding. Each Member hereby represents and warrants that the Company shall comply with all reporting and withholding requirements imposed with respect to "foreign persons," as defined in the Code, and any Member that is a foreign person shall be

obligated to contribute to the Company any funds necessary to enable the Company (to the extent not available out of such Member's share of Available Cash) to satisfy any withholding obligations. In the event any Member shall fail to contribute to the Company any funds necessary to enable toe Company to satisfy any withholding obligation, the Manager shall have the right to offset against any payments due and owing to such Member, or its Affiliates, the amounts necessary to satisfy such withholding obligation, or, in the event the Company shall be required to borrow funds to satisfy any withholding obligation by reason of a Member's failure to contribute such funds to the Company, the Manager shall have the right to offset against said Member's present and future distributions, an amount equal to the amount so borrowed plus the greater of (i) the Company's actual cost of borrowing such funds, or (ii) the amount borrowed, multiplied by the Stipulated Rate.

10.16 Legal Representation. The Company may retain one or more legal counsel ("Law Firm"), from time to time, to represent the Company on specified matters and the Members hereby recognize and acknowledge that representation of the Company shall not establish any attorney-client relationship between the Members and the Law Firm. It is further expressly acknowledged and agreed by the Members, that any Law Firm representing the Company may also represent a Member or any Affiliates of a Member. The Members hereby acknowledge and agree that: (i) McDonald Hopkins LLC has represented the Manager in the preparation of this Agreement and the organization of the Company, and may hereafter represent the Company and the Manager in other matters; (ii) each Member has waived any conflict of interest that exists as a result of such representation; and (iii) each Member has consulted with such independent legal counsel (if any) that the Member deems appropriate before entering into this Agreement.

THIS SPACE INTENTIONALLY BLANK
SIGNATURES CONTINUED ON FOLLOWING PAGE

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement effective as of the day and year first above written.

COMPANY:

CBK Group 10, LLC, a Florida limited liability company

By: CBK Financial Solutions, LLC

_________________________, Manager

INITIAL MEMBER:

CBK Financial Solutions, LLC

By: _________________________, Manager

<u>CBK Group 10, LLC</u>

MEMBER'S SIGNATURE PAGE AND POWER OF ATTORNEY

The undersigned, desiring to become a Member of CBK Group 10, LLC, a Florida limited liability company (the "Company"), hereby adopts and agrees to be bound by all of the terms and provisions of the Operating Agreement of the Company and hereby agrees that the execution of this document is intended and shall be deemed to constitute the execution by him of the Operating Agreement as a Member.

The undersigned, by his execution hereof, irrevocably makes, constitutes and appoints the Manager, with full power of substitution, his true and lawful attorney-in-fact, for him and his name, place and stead, to make, execute, sign, acknowledge, swear to, deliver, record and file any document or instrument which may be considered necessary or desirable by the Manager to carry out the provisions of the Operating Agreement, as more fully set forth in the Operating Agreement of the Company.

This Power of Attorney is a special power of attorney coupled with an interest, is irrevocable and shall survive the undersigned's death or incapacity or the transfer of his interest in the Company, as more fully described in the Operating Agreement of the Company.

Dated:____________________, 2023.

INDIVIDUAL MEMBER:

______________________________
Print Name:

Address:_________________________

Phone: _________________________

Facsimile: ______________________

E-Mail: ________________________

Subscription Amount:$___________

CORPORATE, PARTNERSHIP, FIDUCIARY OR OTHER ENTITY:

By:_________________________________
Name: ______________________________
Title: _______________________________

**SCHEDULE A**

**MEMBERS**

| **Name & Address** | **Capital Contribution** | **Member Percentage** |
| --- | --- | --- |
| Manager: | | |
| CBK Financial Solutions, LLC<br>140 Royal Palm Way, STE 103<br>Palm Beach, FL 33480<br>Attention: Kyle McFadden, Manager | 0 | 0 |
| Members: | | |

CBK Group 10, LLC

MEMBER'S SIGNATURE PAGE AND POWER OF ATTORNEY

The undersigned, desiring to become a Member of CBK Group 10, LLC, a Florida limited liability company (the "Company"), hereby adopts and agrees to be bound by all of the terms and provisions of the Operating Agreement of the Company and hereby agrees that the execution of this document is intended and shall be deemed to constitute the execution by him of the Operating Agreement as a Member.

The undersigned, by his execution hereof, irrevocably makes, constitutes and appoints the Manager, with full power of substitution, his true and lawful attorney-in-fact, for him and his name, place and stead, to make, execute, sign, acknowledge, swear to, deliver, record and file any document or instrument which may be considered necessary or desirable by the Manager to carry out the provisions of the Operating Agreement, as more fully set forth in the Operating Agreement of the Company.

This Power of Attorney is a special power of attorney coupled with an interest, is irrevocable and shall survive the undersigned's death or incapacity or the transfer of his interest in the Company, as more fully described in the Operating Agreement of the Company.

Dated:___________________, 2023.

INDIVIDUAL MEMBER:

______________________________

Print Name:

Address:_______________________

Phone: ________________________

Facsimile: _____________________

E-Mail: _______________________

Subscription Amount:$___________

CORPORATE, PARTNERSHIP, FIDUCIARY OR OTHER ENTITY:

By:______________________________

Name: ___________________________

Title: ____________________________

IN WITNESS WHEREOF, the parties have executed this Subscription Agreement as of the date of acceptance set forth beneath the date of the last signature hereon.

**SUBSCRIBER:**

_________________________________ Total Subscription Amount: $__________

Print Name

_________________________________

Signature/Title (if applicable)

_________________________________

Number & Street of Principal Address

_________________________________

City, State and Zip Code

_________________________________

EIN/Social Security Number

Telephone:_________________________

Fax:______________________________

Email:_____________________________

Manner in which the Interest is to be held:

________ Individual Ownership

________ Tenants-in-Common

________ Joint Tenants with Right of Survivorship

________ Community Property

________ Entity

________ Trust

________ Corporation

________ Other (please indicate)